1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19
20
21

| | |
|---|---|
| SPECTRUM PACIFIC WEST, LLC, a Delaware limited liability company,<br><br>                                        Plaintiff,<br><br>   v.<br><br>IMPERIAL IRRIGATION DISTRICT; GINA DOCKSTADER, in her official capacity as Chairwoman of the Imperial Irrigation District Board of Directors; and J.B. HAMBY; ALEX CARDENAS; LEWIS PACHECO; and KARIN EUGENIO, in their official capacities as members of the Imperial Irrigation District Board of Directors,<br><br>                                        Defendants. | Case No.:  25-cv-520-DMS-MMP<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |

22
23
24
25
26
27
28

    Plaintiff Spectrum Pacific West, LLC claims to be an industry-leading communications provider offering broadband, voice, video, and mobile services to communities across the United States.  (Compl., ECF No. 1, ¶ 19).  Plaintiff alleges 32 million people in 41 states—including nearly 5.2 million in California—rely on its broadband network to contact emergency services; communicate with family, friends, and coworkers; work remote jobs; attend telehealth appointments, virtual interviews, and

1

online classes; and enjoy digital media, including everything from reading the local newspaper to watching streaming programs. (*Id.*). Given the importance of public communication and networking, Plaintiff alleges the Supreme Court has recognized that access to legacy utility poles by communications providers to attach their cables is "essential," *Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 330 (2002), as those poles provide "virtually the only practical physical medium of the installation" of such cables. (Compl. ¶ 23 (citing *FCC v. Fla. Power Corp.*, 480 U.S. 245, 247 (1987))).

Plaintiff alleges its dependence on public electric utilities for access to essential infrastructure leaves it vulnerable to exploitation by public utilities like Defendant Imperial Irrigation District ("IID"), who can leverage its dominant position and impose excessive fees through "monopoly rents," *Gulf Power*, 534 U.S. at 330, for pole access. (Compl. ¶ 25). According to Plaintiff, that is why California law requires public electric utilities to provide communication service providers with utility pole space to attach their cables and to do so for cost-based fees set by a statutory formula, and through codified procedures. (*Id.* ¶¶ 27–31). Plaintiff alleges Defendants have defied this mandate and denied Plaintiff entitlement to guaranteed pole access on statutorily mandated terms by imposing an unlawful pole attachment fee without the cost-based justification and procedures that state law and federal due process require. (*Id.* ¶ 32). Defendants dispute that federal due process applies, contending Plaintiff has no protected property interest in legislative ratemaking. (Mot., ECF No. 12, 14–15). Defendants also contend that Plaintiff has failed to plead plausible procedural claims under California law. (*Id.* at 16–24).

Pending before the Court is Defendants IID and its Board of Directors' Motion to Dismiss Plaintiff's Complaint. (*See generally id.*). Plaintiff filed a response in opposition, (Opp'n, ECF No. 22), and Defendants filed a reply, (Reply, ECF No. 24). The matter was submitted on the briefs under Civil Local Rule 7.1(d)(1). For the following reasons, Defendants' Motion is granted in part and denied in part.

//

2

# I.    BACKGROUND

IID is a public electric utility that owns and operates tens of thousands of utility poles in Imperial County.  (Compl. ¶ 24).  IID charges telephone and power companies for access to those poles.  (*Id.* ¶¶ 24, 26).  Plaintiff, which is managed by Charter Communications, Inc. ("Charter"), is one of the communications providers that pays IID for access to those utility poles and use of IID's rights-of-way.  (*Id.* ¶¶ 5, 24).  As of the filing of Plaintiff's Complaint, IID charged Charter an annual fee of $14.17 per pole for access to "nearly 21,000 IID-owned poles."  (*Id.* ¶ 24).

On May 20, 2024, IID informed Charter that it planned to increase the annual access fee to $22.63 per pole ("First Fee Proposal")—"nearly a 60% increase from the then-applicable fee of $14.17."  (*Id.* ¶ 33).  The proposed increase would become final after presentation to and vote by IID's Board of Directors.  (*Id.*).  An information session about the fee increase was scheduled for June 4, 2024.  (*Id.*).  Charter then emailed IID to request IID's calculation of the proposed fee.  (*Id.* ¶ 34).  IID "responded with a list of the 'new fee rates'—including the annual $22.63 per foot attachment fee—stating that the proposed attachment fee was a 'rough estimate' and that 'there may be a slight difference depending on new attachments and removal after the audit.'"  (*Id.*).  This response did not provide IID's exact calculation of the proposed fee.  (*Id.*).  Then, on May 30, 2024, IID canceled the June 4, 2025 information session due to "unforeseen circumstances."  (*Id.*).

On June 5, 2025, Charter sent another email to IID, "explaining that Charter's pole attachment team had reviewed the fee schedule but did not have the underlying data to verify that the calculation complied with California Public Utilities Code[1] [section] 9512(a)(1)-(3)."  (*Id.* ¶ 35).  Without the data, Charter "could not confirm the accuracy of IID's calculations."  (*Id.*).  IID never responded to Charter's requests for data nor its concerns about IID's potential noncompliance with the Utilities Code.  (*Id.* ¶ 36).

---

[1] The California Public Utilities Code is hereinafter referred to as "Utilities Code" unless otherwise indicated.  Except for 42 U.S.C. § 1983, all references are to California statutes.

On August 23, 2024, IID informed its pole attachment customers by certified mail that it intended to present a revised pole attachment fee after its October 1, 2024 Board of Directors meeting. (*Id.*). The notice did not disclose the exact proposed fee or how the fee would be calculated. (*Id.*). The notice only stated that IID would make a "report study" available "upon written request" and on IID's website ten days before the October 1, 2024 meeting. (*Id.*). Charter emailed IID on September 5, 2024, to formally request the report study. (*Id.* at ¶ 37). IID never responded to this request. (*Id.*). Seven days before the October 1, 2024 meeting, Charter renewed its request by email to IID. (*Id.*). IID again did not respond to Charter's request. (*Id.*). Charter eventually found the report study ("First Draft Report") on IID's website, which was posted on September 19, 2024. (*Id.*).

The First Draft Report proposed a $24.88 pole attachment fee ("Second Fee Proposal"). (*Id.* ¶ 38). This report was allegedly prepared by consultants at NewGen Strategies and Solutions ("NewGen") and did not provide the relevant information, calculations, and raw data that served as the basis for the new proposed fee. (*Id.*). Charter again relayed its concerns about the fee calculation to IID and requested that IID postpone the October 1, 2024 meeting until the missing information could be disclosed to and scrutinized by Charter. (*Id.* ¶ 39). Charter's efforts to get any response from IID continued until minutes before the October 1, 2024 meeting commenced, where IID partially clarified some aspects of its fee calculation. (*Id.* ¶¶ 40–41). IID never produced all the data Charter requested and had NewGen present the proposed $24.88 attachment fee to its Board of Directors at the meeting. (*Id.* ¶¶ 41–42). No new information was disclosed at the meeting, and the Board, over Charter's objections, set the proposed fee increase for adoption by ordinance at a second public meeting on November 5, 2024. (*Id.* ¶ 42).

In a series of emails following the October 1, 2024 meeting, Charter continued to request information from IID about the proposed fee increase while also informing IID about alleged calculation errors in the First Draft Report. (*Id.* ¶ 43). Such alleged errors included the report's (1) failure "to exclude from its annual costs of ownership 'costs for any property not necessary for use by the communications service provider'"; (2) failure

to exclude "unnecessary appurtenances" from IID's annual cost figure; and (3) improper inclusion of "costs in its fee calculation that had already been recovered directly from communications providers." (*Id.* ¶¶ 44–45).

IID never addressed these concerns in writing or in public, but did have a private conference with Charter and NewGen on October 22, 2024, where IID "admitted to several of the errors that Charter had identified" and "revealed that NewGen had prepared another further revised fee calculation." (*Id.* ¶ 47). However, IID declined to provide the exact revised fee increase and the underlying data behind the increase to Charter. (*Id.*). NewGen did explain "that it had reversed its decision to use IID's actual cost data for a fundamental input used to calculate IID's return on its pole investment" and instead "used data from . . . investor-owned utilities to develop a new cost input." (*Id.* ¶ 48). Consequently, NewGen "doubled the return on IID's pole investment compared to the return NewGen had previously calculated using IID's own actual costs." (*Id.* ¶ 49).

On October 24, 2024, IID held another private conference where Charter objected to NewGen's "use of investor-owned utility cost data in place of IID's actual cost data," while also reiterating its earlier requests for data. (*Id.* ¶ 50). IID again declined to provide that data and indicated that a "supplemental report would be made available at the November 5, 2024 meeting where IID intended to adopt the new (but not yet disclosed) third fee proposal." (*Id.*).

Shortly after the October 24, 2024 meeting, IID published the supplemental report ("Second Report"). (*Id.* ¶ 51). The Second Report recommended a new attachment fee of $21.96 per pole ("Third Fee Proposal"). (*Id.* ¶ 52). It also continued NewGen's past practice of "apply[ing] investor-owned utility data" in its final calculations. (*Id.*). As to this proposed fee, IID "did not schedule a new set of public hearings to review the new fee increase disclosed in the Second Report." (*Id.* ¶ 53). Rather, IID incorporated the Third Fee Proposal into its Second Fee Proposal process and set it for adoption by resolution at its November 5, 2024 meeting. (*Id.*).

Charter again renewed its efforts to have IID correct what it viewed as errors in the Third Fee Proposal and Second Report.  (*Id.* ¶ 54).  Charter "emailed IID about new (and certain prior) errors in NewGen's third fee increase calculations." (*Id.*).  Charter offered to work with IID to resolve these alleged errors and again asked for the underlying data. (*Id.*).  IID declined these offers.  (*Id.*).  Finally, on November 4, 2024, Charter sent IID a letter summarizing its concerns and requesting a postponement of any approval of the Third Fee Proposal.  (*Id.*).  IID did not respond to this letter and its Board of Directors adopted Resolution No. 35-2024 on November 5, 2025, officially approving the Third Fee Proposal.  (*Id.* ¶¶ 54–55).

Following this adoption, Charter initiated post-hoc requests for data under various California statutes.  (*Id.* ¶ 56).  First, Charter filed a public records request for the data underlying the Third Fee Proposal under the California Public Records Act ("CPRA"). (*Id.*).  IID responded to Charter by email, explaining that it required additional time to respond because "some of the requested records were in possession of 'establishments that are separate from the office responding to the request.'"  (*Id.* ¶ 57).  Charter further requested that IID at least provide records on a rolling basis but received no response from IID.  (*Id.*).  Second, Charter filed a written protest letter with IID's Board of Directors pursuant to Utilities Code section 9517(a).  (*Id.* ¶ 58).  The public records request was partially fruitful—IID produced 28 responsive documents to Charter on December 9, 2024. (*Id.* ¶ 59).  Though IID claimed that these documents represented the universe of documents responsive to Charter's request, subsequent conversations between Charter and IID proved this to be incorrect as IID eventually produced an additional 36 responsive documents.  (*Id.* ¶ 60).  Of those 36 documents, ten were substantially redacted without further explanation from IID.  (*Id.*).

Charter then filed the present Complaint on March 5, 2025.  Charter requests declaratory and injunctive relief under (1) 42 U.S.C. § 1983 for violation of its procedural due process rights under the Fourteenth Amendment to the U.S. Constitution; (2) Utilities Code section 9511 for IID's failure to make its utility poles available for Charter's use

"pursuant to reasonable terms and conditions"; (3) Utilities Code section 9512 for IID's failure to apply a statutorily mandated formula when it calculated the Third Fee Proposal; (4) Utilities Code section 9516 for IID's failure to follow mandatory procedural requirements when adopting or increasing pole attachment fees; (5) Government Code sections 54951 *et seq.* (the "Brown Act") against Defendant Board Members J.B. Hamby, Alex Cardenas, Lewis Pacheco, and Karin Eugenio for failure to make available to the public certain agenda packets, information, and meeting materials relating to certain IID Board meetings; and (6) Government Code sections 7920 *et seq.* (the CPRA) for failure to timely and adequately respond to requests for public records. (*Id.* ¶¶ 61–110). Plaintiff requests declaratory relief that Defendants violated Plaintiff's procedural due process and statutory rights; injunctive relief preventing Defendants from enforcing the Third Fee Proposal; production of all responsive documents under the CPRA; and reasonable attorneys' fees and costs. (*Id.* at 24).

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. If Plaintiff "ha[s] not nudged [its]

claims across the line from conceivable to plausible," the complaint "must be dismissed." *Id.* at 570.

In reviewing the plausibility of a complaint on a motion to dismiss, a court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, courts are not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).

## III.    JUDICIAL NOTICE

Defendants ask this Court to take judicial notice of Resolution No. 35-2024, which approved the Third Fee Proposal; the IID October 1, 2024 Board Meeting Agenda; the IID November 5, 2024 Board Meeting Agenda; and the California State Assembly Committee on Appropriations SB 274 Bill Analysis. (ECF Nos. 14, 24-1). Plaintiff does not object. Because the existence of these public records is not subject to reasonable dispute, Fed. R. Evid. 201(b), the Court takes judicial notice of them. However, the Court does not take judicial notice of the truth of the facts asserted in these records. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (stating "a court cannot take judicial notice of disputed facts contained in such public records").

## IV.    DISCUSSION

Defendants challenge Plaintiff's First, Fourth, Fifth, and Sixth Claims for Relief under 42 U.S.C. § 1983, Utilities Code section 9516, the Brown Act, and the CPRA, respectively, for failure to state a claim. These arguments are addressed in turn.

### a.    42 U.S.C. § 1983—Procedural Due Process

"The Due Process Clause 'forbids the governmental deprivation of substantive rights without constitutionally adequate procedure.'" *Armstrong v. Reynolds*, 22 F.4th 1058, 1066 (9th Cir. 2022) (quoting *Shanks v. Dressel*, 540 F.3d 1082, 1090–91 (9th Cir. 2008)). "A section 1983 claim based upon procedural due process [under the Fourteenth

Amendment to the U.S. Constitution] . . . has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Id.* (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)). Defendants challenge the first element: whether Plaintiff has a property interest protected by the Fourteenth Amendment's Due Process Clause. (Mot. at 14). Specifically, Defendants argue Plaintiff does not have a protected property interest in a particular rate. (*Id.* at 14–15). Defendants also argue that the fee increase was entirely a "legislative act" that is not subject to procedural due process protections. (*Id.* at 15–16).

### i. Protected Property Interest

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms." *Armstrong*, 22 F.4th at 1066–67 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972)). "Key to a property interest determination is whether the person alleging a due process violation has an entitlement to the benefit at issue, conferred through statute, regulation, contract, or established practice. Property interests are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 1067 (quoting *Bd. of Regents of State Colls.*, 408 U.S. at 577).

"[N]ot every statute authorizing a benefit creates a property interest." *Id.* at 1072 (quoting *Doyle v. City of Medford*, 606 F.3d 667, 672 (9th Cir. 2010)). "To have a property interest in a benefit, a person must have a legitimate claim of entitlement to it, not just an abstract need or desire for it." *Redd v. Guerrero*, 84 F.4th 874, 893 (9th Cir. 2023) (quoting *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 972 (9th Cir. 2015)). "Whether an expectation of entitlement is sufficient to create a property interest 'will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [decisionmaker].'" *Armstrong*, 22 F.4th at 1072 (quoting *Allen v. City of*

*Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990)). "'[I]f the statute sets out conditions under which the benefit *must* be granted or if the statute sets out the *only* conditions under which the benefit may be denied,' then the statute creates an entitlement to the benefit sufficient to create a property interest." *Id.* (quoting *Allen*, 627 F.2d at 180). "But '[i]f the decision to confer a benefit is unconstrained by particularized standards or criteria, no entitlement exists.'" *Id.* (quoting *Allen*, 627 F.2d at 180).

Plaintiff alleges it has protected property interests under Utilities Code sections 9511 and 9512, which contain language regarding the process and standards IID must follow to impose fees for access to its poles. First, Section 9511(a) generally mandates that local entities like IID "shall make appropriate space and capacity on and in a utility pole and support structure owned or controlled by the local publicly owned electric utility available for use by a communications service provider pursuant to reasonable terms and conditions." Cal. Pub. Util. Code § 9511(a). To the extent IID "has the authority pursuant to other law to impose a fee to provide the use described in Section 9511, that fee shall be adopted and levied consistent with the requirements of this part." *Id.* § 9511.5(a). Any access fee shall be determined pursuant to Section 9512, *see id.* § 9511.5(b), which requires the following:

> An annual fee charged by a local publicly owned electric utility for the use of a utility pole by a communications service provider shall not exceed an amount determined by multiplying the percentage of the total usable space that would be occupied by the attachment by the annual costs of ownership of the pole and its supporting anchor. As used in this paragraph and paragraph (2), "usable space" means the space above the minimum grade level that can be used for the attachment of wires, cables, and associated equipment. It shall be presumed, subject to factual rebuttal, that a single attachment occupies one foot of usable space and that an average utility pole contains 13.5 feet of usable space.

*Id.* § 9512(a)(1). Section 9512(a)(2) further restricts the amount of an annual access fee, mandating that the fee "shall not exceed the local publicly owned electric utility's annual costs of ownership of the percentage of the volume of the capacity of the structure rendered

10

unusable by the equipment of the communications service provider." *Id.* § 9512(a)(2). "Annual costs of ownership" is further defined by Section 9512(a)(3):

> As used in this subdivision, the "annual costs of ownership" is the sum of the annual capital costs and annual operation costs of the pole or support structure, which shall be the average costs of all similar utility poles or structures owned or controlled by the local publicly owned electric utility. The basis for the computation of annual capital costs shall be historical capital costs less depreciation. The accounting upon which the historical capital costs are determined shall include a credit for all reimbursed capital costs. Depreciation shall be based upon the average service life of the utility pole or support structure. "Annual cost of ownership" does not include costs for any property not necessary for use by the communications service provider.

*Id.* § 9512(a)(3).

Against this statutory backdrop, Plaintiff has sufficiently alleged California's Utilities Code prescribes mandatory criteria that IID must follow when calculating pole access fees. First, the fee cannot "exceed an amount determined by multiplying the percentage of the total usable space that would be occupied by the attachment by the annual costs of ownership of the pole and its supporting anchor." *Id.* § 9512(a)(1). Second, the "annual costs of ownership" must be calculated as "the sum of the annual capital costs and the annual operation costs of the pole or support structure." *Id.* § 9512(a)(3). The latter is "the average costs of all similar utility poles or structures owned or controlled by [IID]." *Id.* The former is "historical capital costs less depreciation," which includes "a credit for all reimbursed." *Id.* Depreciation must "be based upon the average service life of the utility pole or support structure." *Id.* Overall, "annual costs of ownership" cannot include "costs for any property not necessary for use by [IID]." *Id.* Sections 9511 and 9512, therefore, give Plaintiff a "legitimate claim of entitlement" to an access fee that is set pursuant mandatory parameters, which "is sufficient to trigger procedural due process protection." *See Armstrong*, 22 F.4th at 1076–77.

Defendants' argument that Plaintiff cannot have a property interest in a certain rate is unpersuasive. Plaintiff does not claim a property interest to a particular rate. Rather, Plaintiff alleges it has statutorily guaranteed access to IID's utility poles at fees calculated

according to a specific formula mandated by law.  (Opp'n at 8–12).  That fee (whatever it might be) is determined by lockstep statutory process.  The alleged property interest arises from and is bound up in the statutorily prescribed access-fee regime, which helps prevent excessive rates by public utilities and confers a benefit on communications providers like Plaintiff in service to a larger societal good—public communication.  Accordingly, the Court finds Plaintiff has sufficiently alleged a protected property interest under the Due Process Clause.[2]

### ii.  Adjudicatory or Legislative Process?

"Before due process rights attach, a person must show that the deprivation occurred as a result of an adjudicatory process rather than a legislative process."  *Blocktree Props., LLC v. Pub. Util. Dist. No. 2 of Grant Cnty. Wash.*, 380 F. Supp. 3d 1102, 1121 (E.D. Wash. 2019) (citation omitted).  "If the matter is one in which 'all are equally concerned,' the matter is a legislative process and due process rights do not attach."  *Id.* (quoting *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915)).  "If the matter is one in which a 'relatively small number of persons [are] concerned, who [are] exceptionally affected, in each case upon individual grounds,' then the process is adjudicatory and due process rights attach."  *Id.* (quoting *Bi-Metallic*, 239 U.S. at 446); *see also Londoner v. City & Cnty. of Denver*, 210 U.S. 373, 385–86 (1908).

The parties disagree whether IID's approval of the Third Fee Proposal was an adjudicatory or legislative act subject to procedural due process.  Plaintiff contends that the statutory ratemaking scheme is quasi-judicial in nature and due process protections apply.  (Opp'n at 19).  Such quasi-judicial features, according to Plaintiff, include (1) statutorily mandated factual determinations; (2) an adversarial setting; (3) a discrete set of regulated entities; and (4) decisions that are subject to judicial review.  (*Id.*).  In contrast, Defendants

---

[2] The Court "need not determine . . . what level of procedural safeguards are constitutionally required" at this stage of the proceedings.  *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979).

argue that courts have routinely held forward looking ratemaking to be a legislative act. (Mot. at 15–16).

Plaintiff argues this case is "not about the public's right to participate in an unstructured, policy-driven, general utility rate-setting process." (Opp'n at 13). As Plaintiff alleges the "only pole attachment fee IID may charge under California law depends on specific factual determinations—such as the size, height, original costs, accumulated depreciation, and relevant maintenance, tax, and debt expenses of its individual poles—and applies only to a small, readily identifiable class of regulated entities that have no meaningful ability to mitigate the charge, and rights to participate in and appeal ID's determination under a fixed legal standard." (*Id.* at 13–14 (citing Compl. ¶¶ 27–31, 63–64)). The Court agrees.

This is not a case involving plenary legislative discretion affecting the public, but rather the exercise of prescribed authority through a codified process affecting a small set of regulated entities. "In determining when the dictates of due process apply . . . . the character of the action . . . determines whether those affected by it are entitled to constitutional due process." *Harris v. Cnty. of Riverside*, 904 F.2d 497, 501–02 (9th Cir. 1990) (finding procedural due process applied where "County's decision to alter its proposed General Plan Amendment specifically to rezone Harris' land constituted a decision which was distinct from, rather than a part of, approval of the General Plan Amendment. This decision, in contrast to approval of the General Plan Amendment, concerned a relatively small number of persons (Harris and the immediately adjacent landowner) rather than the entire population of the West Coachella Valley"). So, too, here.[3]

---

[3] Even if Defendants' acts were deemed to be legislative in nature, Plaintiff has sufficiently alleged due process protections apply. "If plaintiff could show that the legislation here was arbitrary or irrational, or that the legislative process was defective, [it] would have a triable issue of fact as to whether [it] had been denied due process." *Rea v. Matteucci*, 121 F.3d 483, 485 (9th Cir. 1997). Plaintiff alleges Defendants' approval of the Third Fee Proposal was arbitrary because Defendants ignored Section 9512(a)(3)'s mandate to consider only "the average costs of all similar utility poles or structures owned or controlled

Accordingly, Plaintiff has stated a claim under § 1983 for violation of its due process rights.

### b. California Public Utilities Code section 9516(b)(1), (a)(3), and (b)(2)

Plaintiff claims that Defendants failed to follow three obligations imposed by Utilities Code section 9516.  First, Plaintiff alleges that Defendants violated Section 9516(b)(1) when it unlawfully delegated authority to NewGen to calculate the Third Fee Proposal.  (Compl. ¶¶ 83–84); (Opp'n at 23–25).  Second, Plaintiff contends that Defendants did not timely publicize the right kind of cost data before IID's board meetings, as required by Section 9516(a)(3).  (Compl. ¶¶ 85–88); (Opp'n at 25–26).  Third, Plaintiff claims that Defendants failed to follow the two-public-meetings sequence required by Section 9516(b)(2) when it adopted the Third Fee Proposal.  (Compl. ¶¶ 89–92); (Opp'n at 26–28).  These arguments are addressed in turn.

### i. Section 9516(b)(1)—Delegation of Authority

Pursuant to Section 9516(b)(1), IID "shall not delegate the authority to adopt or increase the fee or term or condition of access to another entity or board or an official or employee of the board."  Cal. Pub. Util. Code § 9516(b)(1).  Generally, such authority cannot be delegated unless "accompanied by safeguards adequate to prevent its abuse." *See Kugler v. Yocum*, 69 Cal. 2d 371, 375 (1968) (quoting *Wilke & Holzheiser, Inc. v. Dep't of Alcoholic Beverage Control*, 65 Cal. 2d 349, 369 (1966)), *overruled in other part by Rice v. Alcoholic Beverage Appeals Bd.*, 21 Cal. 3d 431, 453 (1978)).

In *Bock v. City Council*, the court confronted delegation of authority unaccompanied by adequate safeguards.  109 Cal. App. 3d 52, 57 (1980), *disapproved on other grounds by Wilde v. City of Dunsmuir*, 9 Cal. 5th 1105 (2020).  There, an initiative would have required the City of Lompoc to "charge its residential customers an electric rate identical to PG&E's schedule D-4"—a "rate approved by the California Public Utilities Commission [PUC]."

---

by [IID]."  Cal. Pub. Util. Code § 9512(a)(3).  As alleged, Defendants unlawfully relied on "investor-owned utility data" to make this determination.  (Compl. ¶¶ 48–49).

*Id.* at 54.  "Lompoc, without any standing before the PUC and without the power to amend the PUC's decision, would then be forced to implement [the electric rate]."  *Id.* at 46.  Since the City of Lompoc would be forced to implement the rate with no adequate safeguards to prevent abuse of the delegated authority, *Bock* invalidated the initiative.  *Id.* at 46–47.

Defendants correctly argue Plaintiff fails to state a claim because Plaintiff does not allege that "IID delegated its ratemaking authority to NewGen, just that the District relied on NewGen's allegedly mistaken advice."  (Reply at 9); (*see* Opp'n at 18 ("Spectrum challenges IID's *decision* to adopt NewGen's proposed fee without applying the independent, cost-specific judgment that California law requires.")).  Specifically, Plaintiff alleges "IID and its Board unlawfully relied upon NewGen's recommendation to allow IID to recover an unlawful return on its pole investment based on irrelevant investor-owned utility data that bears no relationship to IID's own costs of providing pole space to attaching entities."  (Compl. ¶ 84).  As Defendants argue, this is a "restated attack on the merits of the fee," (Reply at 9), not an unlawful delegation of authority to its consultant.  IID's Board of Directors was free to exercise discretion and vote down NewGen's recommendation. IID's discretion was an "adequate safeguard."  Accordingly, the Court **DISMISSES** Plaintiff's Section 9516(b)(1) claim.

## ii. Section 9516(a)(3)—Information Disclosure

At least 10 days before the "one open and public meeting . . . [where] oral or written presentations relating to the fee or term or condition of access may be made[,] . . . [IID] shall make available to the public *data indicating the cost*, or estimated cost, to make utility poles and support structures available for use by a communications service provider."  Cal. Pub. Util. Code § 9516(a)(1), (3) (emphasis added).  The parties dispute what "data" is required by the statute.  (Mot. at 18–19); (Opp'n at 25–26); (Reply at 12).  Defendants contend that the summary information provided in its publicized fee reports, i.e., "the ratemaking method, supporting data, and recommended rates," is sufficient.  (Mot. at 19). Plaintiff asserts more granular cost data is required.  (Opp'n at 25–26).

25-cv-520-DMS-MMP

"When construing a statute, a court's goal is 'to ascertain the intent of the enacting legislative body so that [the court] may adopt the construction that best effectuates the purpose of the law.'"  *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 567 (2007) (quoting *Hassan v. Mercy Am. River Hosp.*, 31 Cal. 4th 709, 715 (2003)).  The Utilities Code does not define "data indicating the cost" and no court appears to have confronted this issue.  Plaintiff alleges, in part, that the term "data" in Section 9516(a)(3) should at least include data used to calculate the summary cost figures disclosed in Defendants' fee reports and NewGen's fee reports lacked such data.  (ECF No. 17, Exs. C, D).  The Court declines to address at this stage what "data" must be produced to satisfy Section 9516(a)(3), but is satisfied Plaintiff has stated a claim under the statute.  Accordingly, the Court declines to dismiss Plaintiff's Section 9516(a)(3) claim.

### iii.  Section 9516(b)(2)—Two Public Meetings

Under Section 9516(b)(2), the governing body of IID "shall approve the ordinance or resolution or contract to adopt or increase *the fee* . . . at a subsequent open and public meeting as part of a regularly scheduled meeting, no earlier than 30 days after the initial public meeting described in subdivision (a)."  Cal. Pub. Util. Code § 9516(b)(2) (emphasis added).  It is uncontroverted that IID held an initial public meeting on October 1, 2024, to discuss the Second Fee Proposal and a subsequent public meeting on November 5, 2025, to adopt by resolution the Third Fee Proposal.  The parties disagree whether Section 9516 requires that the initially proposed fee and subsequently adopted fee involved in the two-meeting process be the *same* fee.  Defendants contend that the Utilities Code merely requires two meetings to occur for IID's Board of Directors to approve any fee.  (Mot. at 10–11).  Plaintiff argues the statute's language requires the proposed fee and adopted fee be the same across the two-meeting process.  (Opp'n at 19–21).

The Court agrees with Plaintiff's interpretation.  Section 9516(b)(2) uses the definite article "the" when referring to "the fee" that is to be approved at the meeting following the "initial public meeting."  This signals the California Legislature's intent to "refer[] to a specific person, place, or thing."  *Pineda v. Bank of Am. N.A.*, 50 Cal. 4th 1389, 1396–97

(2010).  If the Legislature wished to allow for any fee to be approved at the second meeting, regardless of what was disclosed and discussed at the first meeting, it would have used the indefinite article "a" in Section 9516(b)(2).  *See id.* at 1396 ("Use of the indefinite articles 'a' or 'an' signals a general reference.").  Further, to adopt Defendants' interpretation would create, as Plaintiff puts it, an "absurdity" where IID could adopt any fee at a Section 9516(b)(2) meeting so long as it held a prior Section 9516(a)(1) meeting on some other fee.  (Opp'n at 20).  This interpretation would not produce "practical or workable results."  *See Gattuso*, 42 Cal. 4th at 567.  Accordingly, the Court declines to dismiss Plaintiff's Section 9516(b)(2) claim.

Defendants also contends Plaintiff lacks Article III standing to bring this claim because "[Plaintiff] does not allege how it would have benefited from a further public meeting[] on the lower increase, or how it is injured by its lack."  (Mot. at 21).  To have Article III standing, Plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("*Spokeo I*").  Defendants focus on the first element.  Plaintiff, the party invoking federal jurisdiction, must clearly allege facts establishing each element.  *Id.*

"Article III standing requires a concrete injury even in the context of a statutory violation."  *Id.* at 341.  "[T]he plausible pleading of a flat out violation of a statutory provision will not necessarily support a civil lawsuit in federal court since 'a bare procedural violation [of a law creating that right], divorced from any concrete harm' will not constitute an injury-in-fact as demanded by Article III."  *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1174 (9th Cir. 2018) (quoting *Spokeo I*, 578 U.S. at 341).  However, "'the risk of real harm' caused by the violation of a procedural right may be sufficient to establish an injury in fact."  *Id.* (quoting *Spokeo I*, 578 U.S. at 341).  To determine whether a concrete harm based on a statutory procedural violation exists, this Court must "ask: (1) whether the statutory provisions at issue were established to protect [the plaintiff's] concrete interests (as opposed to purely procedural rights), and if so,

(2) whether the specific procedural violations alleged in [the] case actually harm, or present a material risk of harm to, such interests." *Id.* (quoting *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017) ("*Spokeo II*")).

Plaintiff has sufficiently alleged injury. The relevant provisions of the Utilities Code were established to ensure access to "local publicly owned electric utilities . . . under reasonable rates, terms, and conditions." Cal. Pub. Util. Code § 9510. "Reasonable rates" necessarily implicate the expenditure of money—"a quintessential injury-in-fact." *See Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011). Defendants' alleged failure to follow the two-meeting process on the same access fee deprived Plaintiff of the opportunity to protect its interests against being charged an unlawfully inflated fee. Plaintiff's injury is also traceable to Defendants' actions of increasing the access fee through an alleged unlawful process, and is redressable under Section 9518 (outlining legal process for challenging public utility ordinances, resolutions and related acts regarding fees or access terms for utility pole or support structure). Accordingly, Plaintiff has alleged Article III standing under Section 9516(b)(2).

### c. Brown Act (Gov't Code sections 5495.1 and 54954.3)

Plaintiff alleges Defendants violated two subsections of the Brown Act. First, in violation of Government Code section 54954.1, Defendants allegedly failed to provide Plaintiff "all the documents constituting the agenda packet" for the October 1 and November 5, 2024 public meetings. (Compl. ¶¶ 98–99). Second, in violation of Government Code section 54954.3, Defendants allegedly deprived Plaintiff a meaningful opportunity to address the Board because it was denied access to core data and cost inputs underlying the proposed fee. (*Id.* ¶¶ 100–01).

### i. Government Code section 54954.1

Government Code section 54954.1 generally requires a legislative body to provide through mail, email, or on its website a "copy of the agenda, or a copy of all the documents constituting the agenda packet, of any meeting" to a requestor. Cal. Gov't Code § 54954.1. Nonetheless, "[f]ailure of the requesting person to receive the agenda or agenda packet

pursuant to this section shall not constitute grounds for invalidation of the actions of the legislative body taken at the meeting for which the agenda or agenda packet was not received." *Id.*

Plaintiff alleges that despite multiple written requests "for information and meeting materials, IID failed to provide the necessary supporting documentation for" the October and November 2024 Board meetings. (Compl. ¶ 99). And "[b]y failing to provide the underlying cost data necessary to evaluate the proposed fee, IID deprived [Plaintiff] of a meaningful opportunity to address the Board on the fee increase." (*Id.* ¶ 101). Defendants argue it "properly interpreted . . . [Plaintiff's request] as a request for public data supporting the proposed fee under Public Utilities Code, section 9516, subd. (a)(3)," and provided that information. (Mot. at 22).

The kinds of "documents constituting the agenda packet" that must be produced is disputed by the parties and need not be determined on the present motion given the parties' dispute over compliance.[4] Accordingly, Plaintiff has stated a claim for declaratory relief, including for an order of compliance, but not for "invalidation" of the challenged fee (or injunctive relief)—as that relief is not authorized by the statute.

### ii.  Government Code section 54954.3

Government Code section 54954.3 provides that "[e]very agenda for regular meetings shall provide an opportunity for members of the public to directly address the legislative body on any item of interest to the public, before or during the legislative body's consideration of the item, that is within the subject matter jurisdiction of the legislative body." Cal. Gov't Code § 54954.3. Plaintiff claims the public comment opportunity was "illusory" and they were denied the opportunity to "participate meaningfully" in the public hearing because Defendants refused to disclose the granular data underlying the proposed fee. (Compl. ¶¶ 100–01); (Opp'n at 29–30). For support, Plaintiffs cite to the discussion

---

[4] A merits determination over whether Defendants' production satisfied the statute can be made on a Rule 56 or other appropriate motion at a later time.

of Section 54954.2(a), a separate subdivision of the Brown Act, in *San Diegans for Open Government v. City of Oceanside*.  4 Cal. App. 5th 637, 643 (2016).  There, the court addressed an agency's obligation to provide "a brief general description of each item of business to be transacted or discussed at the meeting, including items to be discussed in closed session."  *Id.*  There is no dispute Defendants complied with that obligation, so *San Diegans for Open Government* is of no assistance.  Plaintiff does not otherwise specifically address Section 54954.3.  Without more, the Court is not inclined to conclude the statute provides Plaintiff's alleged relief.  Thus, Plaintiff has failed to state a claim on this ground.  The Court hereby **DISMISSES** Plaintiff's Section 54954.3 claim.

### d.  California Public Records Act (CPRA)

Pursuant to the CPRA, "every person has a right to inspect any public record, except as otherwise provided."  Cal. Gov't Code § 7922.525.  "The CPRA broadly defines 'public records' to include 'any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency.'"  *Illoh v. Regents of Univ. of Cal.*, 87 Cal. App. 5th 513, 523 (2023) (quoting Cal. Gov't Code § 7920.530(a)).  The "[California] Constitution requires that these provisions furthering the people's right of access to information be 'broadly construed.'"  *Id.* (quoting Cal. Const. art. I, § 3).  The agency must initially respond to the request for a copy of records "within 10 days from receipt of the request" by "stat[ing] the estimated date and time when the records will be made available.  Cal. Gov't Code § 7922.535(a).  Under "unusual circumstances,"[5] the head of the agency or a designee to the person making the request may, "by written notice . . . setting forth the reasons for the extension and the date on which a determination is expected to be dispatched," extend the prior deadline to respond by up to 14 additional days.  *Id.* § 7922.535(b).  The CPRA "places on the government agency the burden of affirmatively showing that withheld materials need not be disclosed."  *ACLU*

---

[5] "Unusual circumstances" are defined by statute in Government Code section 7922.535(c).

*of N. Cal. v. Superior Ct.*, 202 Cal. App. 4th 55, 82 (2011).  This obligation applies in full to redactions of produced documents.  *Id.* at 85–86.

Here, Plaintiff submitted a request under the CPRA on November 13, 2024.  (Compl. ¶ 106).  Twelve days following receipt of that request, IID provided written notice to Plaintiff indicating it needed until December 9, 2024 to respond "because some of the requested records were in the possession of 'establishments that are separate from the office responding to the request.'"  (*Id.* ¶ 57).  On December 9, 2024, IID produced 28 documents and claimed those documents represented the universe of documents responsive to Plaintiff's CPRA request.  (*Id.* ¶ 59).  After further discussion with counsel, IID produced 36 additional documents on February 25, 2025.  (*Id.* ¶ 60).  Of the 36 documents, ten were "substantially redacted" with no noted exception or justification.  (*Id.*).

Plaintiff alleges IID unreasonably delayed its response until after Plaintiff's protest under Section 9517 was due and failed to produce all responsive records sufficient to satisfy its CPRA obligations.  (*Id.* ¶¶ 107, 108).  By unreasonably delaying and failing to produce the requested records, Defendants "deprived Plaintiff of an opportunity to be heard on the fee increase before it went into effect, depriving [Plaintiff] of its due process rights."  (*Id.* ¶ 109).  Plaintiff seeks declaratory and injunctive relief compelling Defendants to produce all responsive records.  Defendants contend Plaintiff's CPRA claim is merely a formulaic recitation of CPRA elements, and that they produced all responsive documents in a timely manner.  (Mot. at 24); (Reply at 15).

While the parties dispute compliance with the CPRA, that disagreement is not resolvable on the present motion.  Plaintiff correctly argues it has stated a claim by alleging it submitted a written CPRA request; that IID's response omitted specific categories of records to validate a public utility fee under state law; and that IID failed to produce those materials prior to the public vote.  (Compl. ¶¶ 56–60, 103–10).  That is sufficient to state a claim.

### e. Prospective Injunctive Relief

Defendants challenge Plaintiff's request for prospective injunctive relief that "any utility pole attachment fees charged by IID conform to the requirements of the California Public Utilities Code[,]" (Mot. at 13 (citing Compl., Prayer for Relief ¶ 5)), and "prohibiting IID and its Board from deviating from statutory requirements for any future fee adoption or increase." (*Id.* (citing Compl. ¶ 4)). Generally, "a '12(b)(6) motion to dismiss challenges the legal sufficiency of the pleadings, not the appropriateness of the relief sought.'" *Gale v. Unifi Aviations, LLC*, No. 24-CV-01355 W (KSC), 2025 WL 991100, at *2 (S.D. Cal. Apr. 2, 2025). Nonetheless, on a Rule 12(b)(6) motion, a Court may consider whether a particular remedy is precluded as a matter of law. *See Sturm v. Rasmussen*, No. 18-CV-01689-W-BLM, 2019 WL 626167, at *3–4 (S.D. Cal. Feb. 14, 2019); *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010).

With respect to Plaintiff's Prayer for Relief for an "Order that any utility pole attachment fees charged by IID conform to the requirements of the California Public Utilities Code[,]" the Prayer is precluded because it would "expose[] [IID] to contempt proceedings if *any* [utility pole attachment fee] . . . violates *any* portion of [the California Public Utilities Code]." *Howard Jarvis Taxpayers Ass'n v. Coachella Valley Water Dist.*, 108 Cal. App. 5th 485, 522 (2025) (emphasis added). The Prayer thus "enjoin[s] behavior sufficiently 'unrelated to the original allegations' such that it [is] overbroad." *Id.* With respect to the prefatory language in the body of the Complaint at Paragraph 4—seeking "an injunction prohibiting IID and its Board from deviating from statutory requirements for any future fee adoption or increase"—that statement is not repeated in the Prayer for Relief, but as with Paragraph 5 of the Prayer it too is untethered to the original allegations and overbroad.

The Court treats the motion to dismiss on these grounds as a motion to strike. *See* Fed. R. Civ. P. 12(f)(1) (stating the "court may strike from a pleading an . . . impertinent . . . matter [and] may act . . . on its own"). The Court therefore strikes Paragraph 5 of the Prayer and Paragraph 4 of the Complaint. As Plaintiff states in response to Defendants'

motion on this ground, Plaintiff "seeks a traditional, well-recognized remedy: a declaration and injunction invalidating and preventing enforcement of a discrete, procedurally defective resolution adopted in violation of federal constitutional and state statutory rights." (Opp'n at 24 (citing Compl., Prayer for Relief ¶¶ 1–7)).  Other than Paragraph 5 of the Prayer and Paragraph 4 of the Complaint, the Court agrees.

## V.    CONCLUSION

Based on the foregoing, Defendants' motion to dismiss is: (1) **GRANTED** without leave to amend as to Plaintiff's Fourth Claim for Relief under California Public Utilities Code section 9516(b)(1) (unlawful delegation of authority) and Fifth Claim for Relief under the Brown Act, Cal. Gov't Code § 54954.1 (production of documents constituting the agenda packet—injunctive relief);[6] (2) **GRANTED** with leave to amend as to Plaintiff's Fifth Claim for Relief under the Brown Act, *id.* § 54954.3 (public comment opportunity); and (3) **DENIED** as to Plaintiff's First Claim for Relief under 42 U.S.C. § 1983 for violation of procedural due process under the Fourteenth Amendment, Fourth Claim for Relief under California Public Utilities Code section 9516(a)(3) (information disclosure) and (b)(2) (two public meetings), Fifth Claim for Relief under the Brown Act, Cal. Gov't Code § 54954.1 (production of documents constituting the agenda packet—declaratory relief), Sixth Claim for Relief under the CPRA, *id.* § 7923.110 (public records production).  In addition, the Court **STRIKES** Paragraph 5 of the Prayer for Relief and Paragraph 4 of the Complaint under Rule 12(f).

Given the substantive claims that survive Defendants' motion to dismiss, Defendants will answer the Complaint within 14 days of the filing of this Order.  Plaintiff may file an amended complaint consistent with this Order within 21 days of the filing of this Order. Defendants may file a Rule 12(c) motion if they wish to challenge any amendment to the Complaint.

---

[6] Because any attempt to amend the Complaint would be futile as to these claims, the motion to dismiss is granted without leave.

1    **IT IS SO ORDERED**.

2    Dated:  August 26, 2025

Hon. Dana M. Sabraw
United States District Judge

25-cv-520-DMS-MMP